IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 16, 2005 Session

## STATE OF TENNESSEE DEPARTMENT OF CHILDREN'S SERVICES v. J.A.H., JR., ET AL.

Appeal from the Juvenile Court for Hamilton County
No. 192,664     Suzanne Bailey, Judge

Filed December 28, 2005

No. E2005-00860-COA-R3-PT

In this case, the biological father of a child contends that the trial court erred in terminating his parental rights. Father argues that the evidence presented is not sufficient to establish statutory grounds for termination and that the Tennessee Department of Children's Services failed to make reasonable efforts toward reunification. Upon our finding that father was incarcerated when the petition to terminate was filed and failed to visit the child for four consecutive months immediately preceding his incarceration and our further finding that the Department made reasonable efforts at reunification, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Cause Remanded**

SHARON G. LEE, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

Robin Ruben Flores, Chattanooga, Tennessee, for the Appellant, J.A.H., Jr.

Paul G. Summers, Attorney General and Reporter, and Douglas Earl Dimond, Senior Counsel, General Civil Division, Nashville, Tennessee, for the Appellee, State of Tennessee, Department of Children's Services.

**OPINION**

**I.**

This appeal arises out of the termination of the parental rights of the Appellant J.A.H., Jr. ("Father") to his son, James[1] who was born on January 9, 2003. The Appellee State of Tennessee Department of Children's Services ("DCS") assumed custody of James and placed him in a foster home immediately after his birth because his biological mother ("Mother") was incarcerated at that time and neither her husband nor Father could be located.

Father attests that he hired an attorney in January or February of 2003 "to get my son - - I want my son to have my name and I wanted my son out of foster care." Father further testifies that he spoke with Jan Humphreys, the DCS case worker assigned the case on the day of James's birth, and advised her that he was James's father and stated his wish to have James live with him. Father attests that he was denied this request because paternity had not been established.

Ms. Humphreys attests that in February of 2003, she met with Father, Mother, and DCS team coordinator Susan Jacquith to prepare a permanency plan. Ms. Humphreys further attests that when this plan was prepared Father had not been identified as James's father by DCS. Our review of the permanency plan, which is dated February 7, 2003, shows that the plan was not signed by Father although it lists him as James's putative father and requires, among other things, that he submit to alcohol and drug testing, undergo parenting assessment, and provide proof of adequate income to provide for James. Ms. Humphreys attests that at this meeting she advised Father what steps he needed to take to legitimize his child, and Father testifies that he initiated the procedure to legitimize James as soon as he was given this information.

Custody of James was restored to Mother on April 16, 2003. At that time, Mother and James resided with Father and Father's mother. Less than two months later, on May 29, 2003, Mother and Father were arrested upon allegations of domestic violence. Subsequently, Mother was jailed on outstanding warrants, and Father was jailed and released on bond. As before, Mother's husband's whereabouts were unknown, and Father had still not legitimized the child. Under these circumstances, DCS again assumed custody of James on June 2, 2003, and the child was placed in the care of a foster family.

On June 12, 2003, an order was entered recognizing that Father was in fact James's biological father based upon the results of DNA testing.

During the month of June, 2003, DCS conducted meetings to develop a second permanency plan dated June 19, 2003. Ms. Humphreys testifies that she contacted Mother by telephone regarding these meetings. Although Ms. Humphreys' confirms that she never spoke directly with Father regarding these meetings, Mother and Father were residing together at that time. Father did not attend any of the meetings to develop the second permanency plan. Ms. Humphreys testifies that although she attempted to provide Father with a copy of this permanency plan by mail on two occasions, on the first occasion the mailing was returned because of inadequate postage and on the

---

[1]Although we ordinarily identify the parties in a parental termination case by their initials only, in this case the similarity of the parties' initials compels us to identify the child by his given name.

second occasion, the mailing was returned stamped "unclaimed." Accordingly, it appears that Father never received a copy of the plan.

At some time in June of 2003 Mother and Father began to visit James weekly under DCS supervision. Ms. Humphreys attests that, although Father missed two or three visits, he was generally "pretty regular" in visiting. However, Ms. Humphreys also attests that Father "had lots of very bad behavior" and that sometimes he would be "highly upset." Susan Jacquith, who is employed by DCS as a team coordinator, attests that she was called in to personally supervise the visits in early September of 2003.

On October 24, 2003, an adjudicatory hearing was held in the juvenile court for Hamilton County. Mother was present at this hearing; however, Father failed to appear. In its order entered November 20, 2003, the juvenile court found James to be dependent and neglected by clear and convincing evidence and awarded custody of James to DCS. The court also stated as follows:

> That based upon the mother's in-court admission during this Hearing that she used crack cocaine the previous night, her obvious state of seriously impaired cognitive ability in court including marked confusion and difficulty answering simple questions, and the fact that she resides in the same home with [Father], all visitation between [Father] and the subject child should be suspended pending a favorable report from an alcohol and drug evaluation/screening of [Father].

Ms. Humphreys testifies that a few days after the hearing she called Father and told him that visitation had been suspended and that it would be reinstated if he submitted to alcohol and drug assessment. Ms. Humphreys states that upon being told this "[Father] started cursing and he said he couldn't believe all the things that he had to do, he doesn't know how I could do that and called me very vulgar names." Although Father attests that he agreed to submit to drug screening so that he could resume visitation with James, he did not do so and he has not seen James since October of 2003.

Mother was incarcerated in March of 2004, and in April of 2004, Father was incarcerated upon charges of theft, harassment, driving on a revoked license, and possession of drug paraphernalia. On June 11, 2004, DCS filed a petition in the juvenile court for Hamilton County to terminate the parental rights of Mother, Father and Mother's husband.

The parental rights of Mother and her husband were terminated on October 25, 2004, and September 20, 2004, respectively.[2] Hearings on the petition to terminate the parental rights of Father were held on January 14, 2005, and February 1, 2005, and on March 8, 2005, the trial court entered an order terminating Father's parental rights and granting DCS the right to place James for adoption.

---

[2]Neither of these terminations is at issue in this appeal.

The court's ruling was based upon findings of willful abandonment, failure to comply with permanency plans, failure to make reasonable efforts to provide a suitable home, and persistence of conditions that led to James's removal. The court further found that termination of Father's parental rights was in James's best interest. Thereafter, Father filed the instant appeal.

**II.**

We address the following issues in this appeal:

1) Whether the trial court's finding of at least one ground for termination is adequately supported by the evidence.

2) Whether Father was denied his right to due process on grounds that DCS failed to make reasonable efforts to assist him in reunification and in establishing a home for his child.

**III.**

A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2059-60 (2000); *Hawk v. Hawk*, 855 S.W.2d 573, 578-579 (Tenn. 1993); *Ray v. Ray*, 83 S.W.3d 726, 731 (Tenn. Ct. App. 2001). Although this right is fundamental and superior to claims of other persons and the government, it is not absolute. *State v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988)(*citing Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute. *Id.*

Termination proceedings are governed by statute in Tennessee. Parties who have standing to seek the termination of a biological parent's parental rights must first prove at least one of the statutory grounds for termination. Tenn. Code Ann. § 36-1-113(c)(1). Secondly, they must prove that termination of the parent's rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2). Because the decision to terminate parental rights has profound consequences, courts must apply a higher standard of proof in deciding termination cases. Therefore, to justify termination of parental rights, the party seeking termination must prove by clear and convincing evidence the ground (or grounds) for termination and that termination is in the child's best interest. Tenn. Code Ann. §36-1-113(c); *In re Valentine*, 79 S.W. 3d 539, 546 (Tenn. 2002).

The heightened burden of proof minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003) *no appl. perm. filed*, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In a non-jury case such as this one, we review the record *de novo* with a presumption of correctness as to the trial court's determination of facts, and we must honor those findings unless the evidence preponderates to the contrary. Tenn. R. App. P. 13(d); *Union Carbide v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings. *Seals v. England/Corsair Upholstery Mfg. Co., Inc.,* 984 S.W.2d 912, 915 (Tenn. 1999). Further, "[o]n an issue which hinges on the credibility of witnesses, the trial court will not be reversed unless there is found in the record clear, concrete, and convincing evidence other than the oral testimony of witnesses which contradict the trial court's findings." *Galbreath v. Harris*, 811 S.W.2d 88, 91 (Tenn. Ct. App. 1990), citing *Tennessee Valley Kaolin Corp. v. Perry*, 526 S.W.2d 488, 490 (Tenn. Ct. App. 1974). After reviewing the trial court's specific factual findings to ascertain that the evidence does not preponderate against them, we must determine whether the elements required for termination are either clearly and convincingly established by the trial court's factual findings or are supported by a preponderance of the evidence. *In re S.M.*, 149 S.W.3d 632, 640 (Tenn. Ct. App. 2004). The trial court's conclusions of law are reviewed *de novo* and are accorded no presumption of correctness. *Campbell v. Florida Steel Corp.,* 919 S.W.2d 26, 35 (Tenn. 1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993).

## IV.

The first issue we address is whether the trial court erred in finding that there were statutory grounds for terminating Father's parental rights. In addressing this issue, we bear in mind that we need not review each of the grounds upon which the trial court based its decision. As long as one statutory ground for termination is established by the facts in this case and termination is in the best interest of the child, the trial court's decision will be sufficiently supported. *In re D.L.B.,* 118 S.W.3d 360, 367 (Tenn. 2003). Father does not contend that the trial court erred in finding that termination of his parental rights was in James's best interest and the evidence in this case does not preponderate against that finding. We must, however, determine whether the evidence also supports a ground for termination under applicable statutory law.

Abandonment is one of the statutory grounds for termination of parental rights which are set forth at Tenn. Code Ann. § 36-6-113(g) and, as we have noted above, this is one of the grounds that the trial court relied on in terminating Father's parental rights in the instant matter. Because Father was incarcerated when DCS filed its petition to terminate parental rights, the relevant definition of "abandonment" is that set forth at Tenn. Code Ann. § 36-1-102(1)(A)(iv):

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration which exhibits a wanton disregard for the welfare of the child.

The trial court's order terminating Father's parental rights is based in part upon the following finding:

> [Father] failed to visit the Child for a period of more than four (4) months when he was free to do so. He has had no contact with the Child since visitation was suspended by the Court in October 2003 pending his providing the Court with evidence of completion of an alcohol and drug assessment. [Father] chose not to submit to the assessment.

It is undisputed that Father did not visit James for four consecutive months preceding his incarceration - Father was incarcerated on April 4, 2004, and has not visited James since October of 2003. However, Father contends that his failure to visit James was not willful. He asserts that "the evidence at trial did not reflect that [he] *wilfully* failed to visit the child within the four month time before his time in custody." We disagree.

As we have noted, the trial court's order of November 20, 2003, suspended visitation between Father and James until Father submitted favorable drug and alcohol evaluation results. As we have further noted, thereafter Ms. Humphreys contacted Father and advised him that resumption of visitation would be contingent upon his drug and alcohol assessment. When asked if he was made aware of the requirement that he submit to this testing before he could visit James again, Father testifies "I agreed to random drug testing to try and get this done." Even though this prerequisite was the only obstacle to further visitation, Father never satisfied it. We also note, as did the trial court, that in his testimony Father acknowledges that an appointment was made for him to undergo drug and alcohol assessment and that he chose not to meet this appointment because it conflicted with his

meeting with an attorney. Father presented no proof that he made any effort at any time to reschedule an assessment.

In *In re Audrey S.,* No. M2004-02758-COA-R3-PT, 2005 WL 2051286 at *13,14 (Tenn. Ct. App. August 25, 2005) *perm. app. dismissed* (Tenn. Nov. 4, 2005), we recently stated as follows with regard to willfulness in the context of a case involving the termination of parental rights:

> Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.
>
> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. (citations omitted)

The trial court found that Father chose not to submit to the testing that was a precondition to further visitation, and Father presents no evidence that preponderates against this finding. Father's choice in refusing to cooperate in this regard constituted a willful decision to discontinue visiting his son. The record supports the conclusion that Father abandoned James under Tenn. Code Ann. § 36-1-102(1)(A)(iv).

We are aware that the trial court based its decision to terminate Father's parental rights on several grounds in addition to that of abandonment and that Father argues that the trial court erred in finding these additional grounds. However, in view of our affirmation of the trial court's decision on the issue of abandonment, we need not address Father's argument that the trial court erred in terminating his parental rights upon these additional grounds. *See In re C.W.W.*, 37 S.W.3d 467, 475 (Tenn. Ct. App. 2000). As we have noted, any one of the grounds listed at Tenn. Code Ann. § 36-1-113(g) is sufficient to support an order of termination and, accordingly, issues raised by Father with respect to other grounds are pretermitted.

## V.

The remaining issue we address in this case is whether DCS violated Father's rights of due process by failing to make reasonable efforts to assist him in reunification and in establishing a home for James. Father contends that the main interest of DCS employee Jan Humphreys was not to return James to him, but rather to place James in an adoptive home. In support of this argument, Father notes that at the termination hearing Ms. Humphreys was asked "Is it your goal to place this child in an adoptive home?" and she answered "Yes." Father also references a DCS quarterly progress report dated December 7, 2004. Section 16 of this report is designated "Permanency Plan Progress - Child's Needs" and compels a listing of each "action plan step, progress made, since last review and remaining barriers." The response at this section states, "James will have a loving, stable, supportive and safe permanent home where all his physical, developmental, emotional, and medical needs will

be met. The barrier is termination of father's parental rights." Father indicates that the second sentence of this response shows that DCS's goal was to place James for adoption rather than to reunify him with Father.

Both the referenced testimony of Ms. Humphreys to the effect that it is her goal to place James in an adoptive home and the cited response in the progress report pertain to a time when DCS had already made reasonable efforts in this case and those efforts had failed. Both Ms. Humphreys testimony and the progress report relate to a point in time after Father had demonstrated his refusal to cooperate by failing to submit to drug and alcohol assessment and had not visited his child for an extensive period, and the best interests of the child dictated that Father's parental rights be terminated. Of course, at that point in time placing James for adoption, not reunification, was the proper goal of DCS. Additional testimony of Ms. Humphreys under cross examination provides further evidence in this regard:

> Q Last question, is there ever a time you had come to a conclusion, in essence that you just wrote a parent off and start focusing on a foster family?
>
> A That was never my job, I was foster care.
>
> .   .   .   .
>
> Q But you facilitated this foster family for an adoption, haven't you?
>
> A No, I have not.
>
> .   .   .   .
>
> Q It's your goal to place this child in adoption, isn't it?
>
> A No, it was my goal to return [James] to the parent.
>
> Q Okay. So that was an incorrect statement that you gave to Mr. Neal a minute ago, that the goal was to place this child in an adoptive home?
>
> A Well, I think it is now but that was not our original intent. Our original intent was to return the child to the parent.

Father's argument that DCS failed to make reasonable efforts in this case and that DCS did not attempt reunification, but only sought to place James for adoption is not supported by the record and is without merit.

## VI.

For the foregoing reasons, we affirm the judgment of the trial court and remand for further action consistent with this opinion.  Costs on appeal are adjudged against the Appellant, J.A.H., Jr.


_____
SHARON G. LEE,  JUDGE